**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 19-cv-00487-RM-STV

WHEATRIDGE OFFICE, LLC, a Colorado corporation,

     Plaintiff,

v.

AUTO-OWNERS INSURANCE COMPANY,
a Michigan corporation,

     Defendant.

_____

**ORDER**
_____

This is a property insurance dispute arising from hail damage to Plaintiff Wheatridge Office, LLC's ("Plaintiff" or "Wheatridge") commercial building in Wheat Ridge, Colorado.  At issue now are the following motions: (1) Plaintiff's Motion for Partial Summary Judgment (ECF No. 118) on Defendant Auto-Owners Insurance Company's ("Defendant" or "Auto-Owners") counterclaims; (2) Defendant's Motion for Summary Judgment (ECF No. 120); (3) Plaintiff's Motion to Preclude or Limit Testimony of Gary Stevens, Peter Marxhausen and Mark Passamaneck (ECF No. 90); (4) Defendant's Motion to Exclude Expert Testimony of Chantal Roberts Pursuant to Fed. R. Evid. 702 (ECF No. 122); (5) Defendant's Motion to Exclude Expert Testimony of Mark Rothbauer Pursuant to Fed. R. Evid. 702 (ECF No. 123); (6) Plaintiff's Motion In Limine to Preclude After Acquired Evidence to Prove Past Fraudulent Intent (ECF No. 157); (7) Plaintiff's Motion In Limine For a Limiting Instruction on and Motion to Preclude Improper Argument on Defendant's Fairly Debatable Affirmative Defense (ECF No. 158); (8) Plaintiff's Motion In Limine to Preclude Testimony and Argument that Compass Adjusting's

Contingency Agreement Creates a Moral Hazard (ECF No. 159); (9) Plaintiff's Motion In Limine for a Limiting Instruction on and/or to Preclude Improper Argument That Reliance on an Expert is an Affirmative Defense (ECF No. 160); (10) Plaintiff's Motion to Preclude Reference to the Consequence of Finding that Defendant Unreasonably Delayed or Denied Payment of Insurance Benefits (ECF No. 161); (11) Plaintiff's Motion In Limine for a Limiting Instruction on and/or to Preclude Improper Argument on Defendant's Failure to Cooperate Defense (ECF No. 162); (12) Plaintiff's Motion In Limine to Preclude Evidence of Steve Louden's Material and Labor Costs from ALM Roofing Services, LLC (ECF No. 163); (13) Plaintiff's Motion In Limine to Preclude Argument and Testimony that the Difference in Estimates' Values Constitutes a Misrepresentation of Material Fact (ECF No. 164); and (14) Plaintiff's Combined Motion to Strike Late Witness Designation of Jerry Payne and Motion In Limine to Preclude Introduction into Evidence of His Axium Report (ECF No. 165) (collectively, "Motions").  The parties filed responses and, in some instances, replies.  The Motions are ripe for resolution. Upon review of the Motions, relevant parts of the court record, and the applicable statutes and case law, and being otherwise fully advised, the Court finds and orders as follows.

## I.      BACKGROUND

Wheatridge owns a three-story office building located in Wheat Ridge, Colorado, that it purchased in 2016 (the "Building").  Prior to purchasing the Building, Wheatridge had an inspection of the property completed, which revealed some needed repairs, including some to the roof, and received a report from the inspectors (the "Axium Report").  Wheatridge insured the Building with Auto-Owners under a commercial property insurance policy, Policy No. 164632-74919537-16 (the "Policy").  (ECF No. 121-2.)  Apparently Auto-Owners did not review the inspection report at that time.  The Policy's provisions included coverage for damage caused by

wind and hail.  It also included an explanation of the insured's duties in the event of a loss, including the duty to promptly notify Auto-Owners of the loss, including descriptions of what happened, and the property involved, as well as a duty to "[s]end us a signed, sworn proof of loss containing the information we request to investigate the claim.  You must do this within 60 days after our request," and to "[c]ooperate with us in the investigation or settlement of the claim." (ECF No. 121-2, pp. 10, 22.)  The Policy also included a condition addressing concealment and misrepresentations by the insured:

> A.  Concealment, Misrepresentation or Fraud
>
> This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time.  It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:
>
> 1.  This Coverage Part;
>
> 2.  The Covered Property;
>
> 3.  Your interest in the Covered Property; or
>
> 4.  A claim under this Coverage Part.

(ECF No. 121-2, p. 36.)

On July 5, 2017, Wheatridge made a claim for damage to the Building as a result of a hail and windstorm that took place on May 8, 2017.  Auto-Owners then assigned the claim to an adjuster, Korrie Cole, and arranged to have the Building inspected.  At that time, on July 10, 2017, Auto-Owners also sent Wheatridge a Request for Proof of Loss and Records, indicating that Wheatridge was obligated to submit a signed, sworn proof of loss within 60 days.  (ECF No. 121-4.)

The company hired by Auto-Owners to inspect the Building submitted its conclusions and summary of loss to the insurers concluding that the Building had suffered some damage

from the hail storm, including damage to 24 solar screens on second- and third-story windows, strikes to the tar and gravel roof covering, including some punctures in places where the roof curved upward, damage to the aluminum-coated parapet walls, and damage to flashing, roof vents, and the rooftop air conditioning unit.  (ECF No. 121-5.)  The company also noted that Wheatridge had reported interior water damage which the inspector observed in two rooms on the third floor of the Building.  The report concluded that the total replacement cost for the damage was $20,180.04 and after accounting for recoverable depreciation the actual cash value of the loss was $15,359.17.  Deducting from that amount the $10,000 deductible, the report recommended making payment for repairs in the amount of $5,359.17.  If depreciation were recovered, the report recommended an additional payment of $4,820.87.

Wheatridge worked with a company called United Restoration to submit its own estimate for repairs.  (ECF No. 121-7.)  After visiting the property and utilizing estimating software called Xactimate, United Restoration submitted and estimate for the repairs totaling $233,232.57.  The estimate included replacement of the Building's roof, removal and replacement of a wooden deck, and installation of new solar screens, among other things.  After reviewing that estimate, Auto-Owners revised its estimate and paid Wheatridge an additional $2,547.47. (ECF No. 121-8.)

Apparently concluding that Auto-Owners' assessment was still inadequate, Wheatridge hired a public adjusting firm, Compass Adjusting, Inc. ("Compass").  (ECF No. 121-9.) Wheatridge Gave Matt Latham and Mark Rothbauer of Compass authority to deal with Auto-Owners on all matters related to the claim.  Compass produced its own estimate of the cost of the damages resulting from the storm, initially concluding it would cost $310,762.93 to make the necessary repairs which apparently included a full replacement of the Building's roof.  (ECF No.

121-13.)  In response to that conclusion, Auto-Owners hired Rimkus Consulting, a different

engineering firm to reinspect the Building.  Rimkus found some hail damage to the roof and

recommended that the parapet membrane flashing be removed and replaced as well as the curb

membrane flashing on the highest roof level.  (ECF No. 121-15.)  Rimkus also recommended

removing and replacing all of the metal parapet caps on the upper roof levels.  Based on the

Rimkus report, Auto-Owners revised its estimate and issued an additional actual cash value

payment of $3,005.69.  (ECF No. 121-18.)

 In June of 2018, Latham contacted Auto-Owners on behalf of Wheatridge to report that

the Building's HVAC unit had "died" and that "there are no replacement parts."  (ECF No. 121-

19.)  He, at least implicitly, attributed the system's failure to the hailstorm in May of 2017.  He

therefore informed Auto-Owners that it "must replace the unit."  Latham also asked that Auto-

Owners make a quick determination regarding coverage of the HVAC and to expedite the claim

generally.  Cole responded that Auto-Owners would be hiring a different HVAC company,

HVACi, to further investigate the damage to the unit and to determine if it was caused by the

hailstorm.  Wheatridge, on advice of Compass, however, informed both HVACi and Auto-

Owners that it would not permit HVACi to access the Building to perform its inspection.  (ECF

No. 121-20.)  During this period Wheatridge had some repairs made to the HVAC unit and was

able to improve its performance significantly, although it maintains that the unit is still not

restored to its pre-loss condition.  (ECF No. 121-12.)

 Wheatridge continued to deny HVACi access to perform the inspection until December

of 2018, when it relented, and the inspection was performed.  (ECF No. 121-23.)  HVACi's

inspection report concluded that the unit had, in fact, been damaged by hail, although it also

showed some wear and tear, and noted that the unit was 36 years old.  HVACi recommended a

settlement for $33,49.56, less applied depreciation of $21,382.17, for a total actual cash value settlement of $11,767.39.  Rothbauer emailed Cole to dispute HVACi's conclusion that the unit could be repaired.  (ECF No. 119-5.)  HVACi informed Cole that replacement parts were available for the unit from the manufacturer.  (ECF No. 119-5).  Auto-Owners issued an additional check for $11,767.39.  (ECF No. 121-24.)  The parties continue to strongly disagree about the significance of these communications between Cole and Latham.

During this same period, the parties continued to disagree about the extent of the damage to the Building's roof.  In September 2018, Rothbauer sent Cole an email indicating that the Building had endured another "substantial storm event" involving rain and smaller hail and informing Auto-Owners that the Building had experienced a number of leaks.  (ECF No. 121-31.)  In order to prevent additional damage, Rothbauer stated, temporary repairs would be made to the Building in the form of applying a new coating to the roof.  Later Rothbauer informed Cole that the emergency repairs had been made and he attached an invoice for work performed by Severy Creek Roofing ("Severy") totaling $81,813.36 and reflecting "emergency roof repair to stop leaking temporarily."  (ECF No. 119-3.)  Auto-Owners did not intend to pay the invoice, indicating in its claim notes that the covered damages were estimated to be less than the invoice amount and because the work performed—re-coating the roof—was outside the scope of the coverage for hail damage.  (ECF No. 119-5.)  In December of that year, Rothbauer again emailed Cole asking that Auto-Owners pay for the emergency repairs performed by Severy, this time attaching an invoice for the same work with a new total of $95,871.57.  (ECF No. 119-4.)  Auto-Owners again declined to pay the invoice.  A final, third invoice was sent to Auto-Owners reflecting a total cost of $104,871.57.  (ECF No. 121-37.)  Neither party ever paid the Severy invoices, as both concluded the amounts were inflated, and Wheatridge is now

engaged in separate litigation with that company.  (ECF Nos. 119-5; 121-18; 121-42.)  The parties strongly dispute whether Rothbauer knew, when he submitted the Severy invoices, that they represented fraudulently inflated prices.

Despite multiple requests from Auto-Owners, Wheatridge did not complete its sworn proof of loss until February of 2019.  (ECF No. 121-26.)  At that time, Rothbauer emailed the Sworn Statement of Proof of Loss to Cole, valuing the claim at $593,040.28.  Rothbauer based this estimate, at least in part, on data obtained by using Xactimate.  (ECF No. 121-38.)  The parties agree that as of this time, Auto-Owners has paid Wheatridge a total of $22,679.99 in actual cash value payments.  Wheatridge filed this suit the day after it submitted its sworn proof of loss.  (ECF No. 1.)

In its First Amended Complaint, Wheatridge asserts claims for (1) breach of contract and (2) unreasonable delay or denial of benefits pursuant to sections 10-3-1115 and -1116 of the Colorado Revised Statutes.  (ECF No. 11.)  It seeks payment of the full amount of the benefit to which it believes it is entitled, as well as to various statutory penalties including twice the amount of the covered benefits.  Auto-Owners filed an Answer and Counterclaims.  Auto-Owners raises claims for (1) a declaratory judgment that the Policy doesn't cover Wheatridge's claims; (2) a declaratory judgment that it is not obligated to pay all or any portion of Wheatridge's claimed damages; (3) breach of contract; (4) breach of the covenant of good faith and fair dealing; (5) unjust enrichment; and (6) recoupment.  (ECF No. 68.)

## II.    LEGAL STANDARD

### A.  Summary Judgment

Summary judgment is appropriate only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Gutteridge v. Oklahoma*, 878 F.3d 1233, 1238 (10th Cir. 2018). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or is so one–sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is there be no genuine issue of material fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation omitted). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *Anderson*, 477 U.S. at 248.

When the court is presented with cross motions for summary judgment, it "must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 906–07 (10th Cir. 2016) (citations and quotations marks omitted). "'Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.'" *Christian Heritage Academy v. Oklahoma Secondary School Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007) (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979)).

### B. Relevance

"The threshold inquiry in any dispute over the admissibility of evidence is whether the evidence is relevant." *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1246 (10th Cir. 2000). In assessing the relevance of proffered testimony, the Court considers whether the evidence has

"any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Civ. P. 401. This assessment depends on whether the proffered evidence has a sufficient logical relationship to the issue at hand to aid the trier of fact. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1234 (10th Cir. 2005) ("Evidence appropriate for one purpose, therefore, may not be relevant for a different purpose, and it is the trial court's task to make this fitness determination."). Even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusion the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Civ. P. 403. "The proponent bears the burden of establishing admissibility." *U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.*, 582 F.3d 1131, 1149 (10th Cir. 2009).

### C. Expert Testimony

Federal Rule of Evidence 702 ("Rule 702") requires a district court to ensure that an expert's testimony is admitted only if it is reliable and relevant. *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)). To do so, the court follows three steps.

The court must decide "whether the proffered expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *Bill Barrett Corp*, 918 F.3d at 770 (quoting Rule 702).

If the expert is sufficiently qualified, the court "'must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology, as set forth in *Daubert*.'" *Id.* (quoting *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc)). In doing so, the court considers 1) whether "the testimony is based on sufficient facts or

data"; 2) whether it "is the product of reliable principles and methods"; and 3) whether "the expert has reliably applied the principles and methods to the facts of this case."  Fed. R. Evid. 702(b)-(d).

There are many factors which may bear on whether expert testimony is based on sound methods and principles, including the following: "whether the theory or technique has (1) been or can be tested, (2) been peer-reviewed, (3) a known or potential error rate, (4) standards controlling the technique's operation, and (5) been generally accepted by the scientific community."  *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1217 (10th Cir. 2016).  "'The focus, of course, must be solely on principles and methodology, not on the conclusions they generate.'"  *Id.* (quoting *Daubert*, 509 U.S. at 595).  And, where a court concludes there is too great an analytical gap between the data and opinion offered, it is not required to admit such opinion evidence.  *Schulenberg v. BNSF Railway Co.*, 911 F.3d 1276, 1283 (10th Cir. 2018).

Finally, the court must determine whether the "proposed testimony is sufficiently 'relevant to the task at hand.'"  *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (quoting *Daubert*, 509 U.S. at 597).  The court evaluates whether the evidence or testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue."  *Daubert*, 509 U.S. at 591 (quoting Fed. R. Evid. 702).  That "'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."  *Id.* at 591-92.

The trial court has discretion to determine "*how* to perform its gatekeeping function under *Daubert*."  *Bill Barrett Corp.*, 918 F.3d at 770 (emphasis in original).  A *Daubert* hearing is not mandated.  *Id.*

### D.  Motions in Limine

Motions in limine can be useful in that they permit the Court to issue rulings in advance of trial regarding the admissibility of certain pieces of evidence, thereby preventing the uncertainty and delay caused by litigating such questions during trial.  *Koch v. Koch Industries, Inc.*, 2 F.Supp.2d 1385, 1387-88 (D. Kan. 1998).  Such rulings, however, are often better left until trial when the Court can assess the question in light of the evidence presented at trial.  *Id.* at 1388.  Deferring such a ruling may be the better practice, particularly in those cases in which "a ruling in limine would have little impact on the parties' evidentiary burdens or preparations for trial."  *Id.*

The moving party bears the burden of demonstrating in their motion in limine that the evidence at issue "is inadmissible on any relevant ground."  *Pinon Sun Condo. Assn. Inc. v. Atain Specialty Ins. Co.*, 2020 WL 1452166 at *3 (D. Colo. March 25, 2020) (quoting *First Sav. Bank, F.S.B. v. U.S. Bancorp*, 117 F.Supp.2d 1078, 1082 (D. Kan. 2000)).  The Court can deny a motion if the movant fails to set out, with the necessary specificity, the evidence it wishes to have precluded.  *Id.*  Denial of a motion in limine, however, does not mean that all the evidence contemplated in the motion will automatically be admitted at trial—"the court may alter its limine ruling based on developments at trial or on its sound judicial discretion" if one of the parties raises the question at that time.  *Id.* (quoting *First Sav. Bank, F.S.B.*, 117 F.Supp.2d at 1082).

### III.     ANALYSIS

### A.  Summary Judgment

In reviewing the cross-motions for summary judgment in this case, it is clear that the essence of the dispute between the parties at this stage of the proceedings turns on whether

Wheatridge forfeited its coverage under the Policy by either failing to cooperate with Auto-Owners as required under the Policy or by violating the anti-misrepresentation clause of the Policy. Each of Auto-Owners' affirmative defenses turn on these questions, as do each of its counterclaims. Therefore, although each motion for summary judgment is analyzed separately, the Court's conclusion as to each turns on the same analysis.

### 1. Plaintiff's Partial Motion for Summary Judgment

Wheatridge moves for partial summary judgment, asking this Court to find in its favor on Auto-Owners' counterclaims. (ECF No. 118.)

#### i. *Declaratory Judgment that Coverage Forfeited*[1]

Auto-Owners' first counterclaim is for declaratory judgment that Wheatridge waived its coverage under the Policy because it failed to cooperate and also because it violated the Concealment, Misrepresentation or Fraud clause.

The Court first considers the alleged failure to cooperate. In order to demonstrate that Wheatridge forfeited its coverage by failing to cooperate, Auto-Owners must demonstrate that Wheatridge failed to cooperate with it "in 'some material and substantial respect.'" *Hansen v. Barmore*, 779 P.2d 1360, 1364 (Colo. App. 1989) (quoting *Farmers Auto. Inter-Insurance Exchange v. Konugres*, 202 P.2d 959, 963 (Colo. 1949)). Furthermore, "Non-cooperation constitutes breach only if material and substantial disadvantage to the insurer is proved." *Hansen*, 779 P.2d at 1364.

Wheatridge argues that it did cooperate with Auto-Owners, and that to the extent it might have failed to do so, Auto-Owners was not prejudiced. Construing the facts in the light most

---

[1] Auto-Owners raises two different claims for declaratory judgment. (ECF No. 68.) Its second claim asserts that the Policy does not provide coverage for Wheatridge damages because they occurred before the inception of the Policy, did not constitute physical losses, or were expressly excluded under the policy. Wheatridge does not separately address this claim in its Motion for Summary Judgment and so it is not addressed in this Order.

favorable to Auto-Owners, as the non-moving party, the Court concludes that a reasonable factfinder could conclude that Wheatridge failed to cooperate in this case.  Auto-Owners presents evidence that, on several occasions, Wheatridge significantly delayed its compliance with Auto-Owners' requests.  The Policy clearly requires the insured to submit a sworn proof of loss statement within 60 days of a request from the insurer.  The evidence demonstrates that Auto-Owners requested the sworn proof of loss from Wheatridge on several occasions, as early as July 10, 2017, yet Wheatridge did not file the sworn proof of loss until February 18, 2019—18 months, as opposed to 60 days, later.  In addition, the evidence demonstrates that despite a request from Auto-Owners to allow HVACi into the Building to evaluate the HVAC unit for the claimed damage, Wheatridge refused to do so for six months.  Considering these actions in the light most favorable to Auto-Owners, they could reasonably be construed as non-cooperation.

Furthermore, a reasonable jury could conclude that those failures to cooperate were prejudicial to Auto-Owners.  One of Wheatridge's claims in this case is for a bad faith delay in insurance benefits and, as Auto-Owners points out, Wheatridge filed this suit only one day after submitting its sworn proof of loss statement.  An insurer can suffer prejudice from "the inability to investigate and assess the extent of [the insured's] damages in a timely way prior to [the insured] filing suit." *Cribari v. Allstate Fire and Cas. Co.*, 375 F.Supp.3d 1189, 1196 (D. Colo. 2019).  A reasonable jury could conclude that Auto-Owners "suffered material and substantial disadvantage by having its investigation delayed and being sued for bad faith as a result." *Id.*

In Colorado, in order to void coverage under the fraud clause, an insurer needs to prove three elements. *Sunflower Condo. Assn. v. Owners Ins. Co.*, 2018 WL 2196089 at *3 (D. Colo. May 14, 2018).  The insurer must prove that (1) the insured misrepresented or omitted a fact; (2) the misrepresentations or omissions were material; and (3) the insured intended to deceive the

insurer.  *Id.*  A misrepresentation is "material" if a reasonable insurance company would have considered the fact important to its investigation, even if the fact is not ultimately significant to the disposition of the case.  *Id.* at *4; *see also Wagnon v. State Farm Fire and Cas. Co.*, 146 F.3d 764, 768 (10th Cir. 1998) (same).  As long as the insured made the misrepresentations "knowingly and deliberately, the intent to deceive the insurer will be implied."  *Wagnon*, 146 F.3d at 771.

In this case, Auto-Owners alleges, and offers evidence to demonstrate, that Wheatridge violated the provision by (1) failing to provide Auto-Owners with a copy of the property inspection performed in 2016, when Wheatridge purchased the Building, and which found some pre-existing wear and damage to the Building; (2) submitting inflated estimates for the repairs to be made by manipulating the Xactimate software; (3) submitting inflated invoices from Severy despite knowing that the amounts were grossly overstated; and (4) claiming that the HVAC unit could not be repaired because no replacement parts were available despite the actual availability of parts and the fact that repairs were, in fact, made to the HVAC unit.  Auto-Owners produced some evidence to support each of these arguments.  (ECF Nos. 121-7, -13, -18, -19, -37, -38, -42, -43.)

Having reviewed the evidence submitted with these motions, the Court concludes that a reasonable factfinder could find that Wheatridge intentionally misrepresented material facts to Auto-Owners.  While the evidence supplied by Wheatridge (discussed below) is enough to allow the opposite conclusion as well, it is not sufficient to permit this court to decide the question as a matter of law.

### ii.  Breach of Contract

Auto-Owners asserts that Wheatridge breached their contract based on the same conduct

discussed above, namely (1) failure to cooperate and (2) violation of the Concealment,

Misrepresentation or Fraud clause.  Wheatridge makes the same arguments to support its

assertion that it did not breach the contract and that the breach of contract counterclaim should be

rejected as a matter of law.

 For the same reasons discussed in the previous subsection, the Court concludes that a

reasonable jury could find that Wheatridge breached its contract with Auto-Owners.  Wheatridge

has failed to meet its burden under the standard for summary judgment to demonstrate that there

are no genuine disputes of material fact and that it is entitled to judgment as a matter of law on

this claim.

### iii.  Breach of the Covenant of Good Faith and Fair Dealing

 Auto-Owners next claim is that Wheatridge violated its duty of good faith and fair

dealing on the same grounds as its first two claims.  For the same reasons, the Court concludes

that a genuine issue of material fact remains, and that summary judgment is inappropriate on this

claim.

### iv.  Unjust Enrichment

 In order to prove a claim of unjust enrichment in Colorado, the plaintiff must prove

"(1) at plaintiff's expense (2) defendant received a benefit (3) under circumstances that would

make it unjust for defendant to retain the benefit without paying."  *Saltzman v. Bacharach*,

996 P.2d 1263, 1265-66 (Colo. 2000).  Auto-Owners asserts that it would be inequitable for

Wheatridge to keep the $22,679.99 it paid in benefits because of Wheatridge's alleged breach of

the contract.  Wheatridge asks for summary judgment on this claim, arguing that in light of the

fact that there is an express contract between the parties, a quasi-contractual remedy is not

available to Auto-Owners.  Auto-Owners refutes Wheatridge's argument by asserting that due to

the alleged breach of contract, the Policy was voided, and the contract no longer exists between the parties.

For the reasons discussed above, the Court concludes that a genuine issue of material fact remains as to whether or not Wheatridge breached the contract. Because that fact question lies at the heart of this claim as well, the Court concludes that summary judgment is not appropriate at this time.

### v. Recoupment

Finally, Wheatridge asserts that it is entitled to summary judgment on Auto-Owners' claim for recoupment. It argues that recoupment is exclusively a defense that can be used only to reduce the total amount owed by a defendant to a plaintiff. Auto-Owners responds that, because the Policy was voided by Wheatridge's breaches, it is entitled to recover all amounts it previously paid on the claim.

While recoupment was originally a common-law equitable remedy that could be used only as a defense, "the defense of recoupment has lost much of its identity under the codes and is generally embraced in the subject of counterclaim." 80 C.J.S. Set-off and Counterclaim § 2; *see also H. R. Kaminsky & Sons, Inc. v. Yarbrough*, 281 S.E.2d 289, 290 (Ga. App. 1981) (noting that recoupment, like setoff, is a counterclaim); *U.S. for Use & Benefit of Greenville Equip. Co. v. U.S. Cas. Co.*, 218 F. Supp. 653, 655 (D. Del. 1962) (the term "counterclaim" "includes those defenses universally known as recoupment and set off"); 80 C.J.S. Set-off and Counterclaim § 9 (same). Moreover, under Colorado precedent, if a factfinder concludes that the insured violated the concealment, misrepresentation, or fraud clause of the insurance contract, thus voiding the policy, the insurance company is entitled to damages in the amount already paid out to the insured. *Frontier Exploration Inc. v. American Nat. Fire Ins. Co.*, 849 P.2d 887,

892-93 (Colo. App. 1992).

Thus, the Court concludes that Auto-Owners can properly plead recoupment as a counterclaim. Furthermore, for all of the reasons previously discussed, a genuine issue of material fact remains regarding whether Wheatridge violated the Concealment, Misrepresentation or Fraud clause of the Policy.  Therefore, summary judgment is improper as to this claim and Wheatridge's Partial Motion for Summary Judgment is DENIED.

### 2.  Defendant's Motion for Summary Judgment

Auto-Owners moves for summary judgment on both of Wheatridge's claims.  (ECF No. 120.)

#### i.  Breach of Contract

Wheatridge's first claim for relief is for breach of contract, asserting that Auto-Owners failed to consider all of the relevant evidence submitted in support of Wheatridge's claim and by failing to pay benefits under the policy.  Auto-Owners argues that it is entitled to summary judgment because it is clear, as a matter of law, that Wheatridge breached the terms of the Policy by failing to cooperate and by misrepresenting and concealing information.

The Court first considers the question of whether Auto-Owners is entitled to summary judgment on the basis that Wheatridge's conduct voided the Policy.  As set forth in the prior discussion, to demonstrate that Wheatridge forfeited its coverage by failing to cooperate, Auto-Owners must demonstrate that the failure was material and substantial and that the breach caused Auto-Owners a material and substantial disadvantage.  *Hansen*, 779 P.2d at 1364.  To demonstrate a breach due to a violation of the Concealment, Misrepresentation or Fraud Clause, Auto-Owners must demonstrate that Wheatridge misrepresented or omitted a material fact and that it did so with the intent to deceive Auto-Owners.  *Sunflower Condo. Assn.*, 2018 WL

2196089 at *3.

As set forth above, Auto-Owners alleges that Wheatridge failed to cooperate by failing to timely complete a sworn proof of loss statement and by refusing access to HVACi when Auto-Owners sent them to investigate the alleged damage to the HVAC unit.  Wheatridge responds that Auto-Owners has failed to show that the alleged failures to cooperate caused it any prejudice.  Viewing its evidence in the light most favorable to the non-moving party, Wheatridge did complete a sworn proof of loss statement, albeit beyond the specified 60 days, but both Wheatridge and its agents, Rothbauer and Latham were in regular contact with Cole to discuss the claim and provide requested information, as well as to update Cole on their own ongoing investigation into the hail damage.  (ECF Nos. 119-1, -2, -3, -4, -5, -6.)  As in the case of Wheatridge's Motion for Summary Judgment, although Auto-Owners' evidence could allow a reasonable jury to conclude that the policy was void for failure to cooperate, construing the evidence in favor of the non-moving party in this case, as it must, leads the Court to conclude that a reasonable jury could decide that Auto-Owners suffered no prejudice from any failure by Wheatridge to cooperate.  Although admittedly a close question, the Court is of the view that a jury should decide the question.

As discussed above, Auto-Owners argues that Wheatridge violated the Concealment, Misrepresentation or Fraud Clause by failing to provide Auto-Owners with a copy of the property inspection, submitting inflated estimates for the repairs and manipulating the Xactimate software, submitting the Severy invoices despite knowing that the amounts were inflated, and claiming that the HVAC unit could not be repaired and that no replacement parts were available.

Wheatridge responds to each of these claims, and presents evidence in support, arguing (1) Auto-Owners never asked for its original property inspection and in any event many of the

issues reported in that report had been repaired; (2) Rothbauer used Xactimate as intended and, in fact, in the same manner Auto-Owners' adjusters are instructed to use it, altering prices to better reflect actual costs in the property's location; (3) although the Severy invoices were extremely inflated, neither Wheatridge nor its agents knew that fact when they submitted the invoices; and (4) although Latham represented that no replacement parts were available for the HVAC unit, he had been referring to manufacturer brand parts, as recommended for the unit, and that although repairs were made to the HVAC it was not returned to its pre-loss condition.  (ECF Nos. 119-9, -10, -14, -15, -16.)  While the Court has previously concluded that a reasonable jury could find that Wheatridge acted intentionally to deceive Auto-Owners, so too could the evidence permit a reasonable jury to conclude that Wheatridge had no intent to deceive or to collect more insurance benefits than those to which it was entitled in order to repair the hail damage to the Building.  Once again, although it is a close question, applying the proper standard the Court concludes that summary judgment is not appropriate on this basis.

> ii.  *Unreasonable Delay or Denial of Insurance Benefits*
> *under§ 10-3-1115 AND §10-3-1116, C.R.S. (2021)*

Auto-Owners again argues that, because Wheatridge's conduct voided the insurance policy, it had no remaining duties under the policy and that therefore, as a matter of law, it could not violate its duty under sections 10-3-1115 and -1116 not to unreasonably delay or deny benefits.  It further argues that even if the Policy isn't void, Auto-Owners' conduct was reasonable as a matter of law.

Under the Colorado statute, an insurer may not unreasonably delay or deny a claim for benefits.  §§ 10-3-1115, -1116.  "[A]n insurer's delay or denial was unreasonable if the insurer delayed or denied authorizing payment for a covered benefit without a reasonable basis for that action."  § 10-3-1115(2).  Unlike in the context of a common law insurance bad faith claim, an

insurer cannot rely on the mere fact that the claim was fairly debatable in order to prove that it acted reasonably as a matter of law. *Fisher v. State Farm Mut. Auto. Ins. Co.*, 419 P.3d 985, 989-90 (Colo. App. 2015). "If a reasonable person would find that the insurer's justification for denying or delaying payment of a claim was 'fairly debatable' (i.e., if reasonable minds could disagree as to the coverage-determining facts or law), then this weighs against a finding that the insurer acted unreasonably." *Sanderson v. Am. Fam. Mut. Ins. Co.*, 251 P.3d 1213, 1217 (Colo. App. 2010). "[F]air debatability is not a threshold inquiry that is outcome determinative as a matter of law, nor is it both the beginning and the end of the analysis in a bad faith case." *Id.* at 1218. Rather, "the question is whether a reasonable insurer under similar circumstances would have denied or delayed payment of the claim. The reasonableness of an insurer's conduct must be determined objectively, based on proof of industry standards." *Thompson v. State Farm Mutual Auto. Ins. Co.*, 457 F.Supp.3d 998, 1003 (internal citations omitted).

Regarding Auto-Owners' first argument, it is correct that, if the Policy is void, then no bad faith claim can stand. *See MarkWest Hydrocarbon, Inc. v. Liberty Mut. Ins. Co.*, 558 F.3d 1184, 1192-93 (10th Cir. 2009) (noting that it is "settled law in Colorado that a bad faith claim must fail if, as is the case here, coverage was properly denied and the plaintiff's only claimed damages flowed from the denial of coverage."); *Tynan's Nissan, Inc. v. American Hardware Mut. Ins. Co.*, 917 P.2d 321, 325-36 (Colo. App. 1995) (same). As set forth in section III(A)(2)(i), however, the Court concludes that a genuine issue of material fact remains as to whether the policy was, in fact, void. Therefore, summary judgment would be improper on this basis.

Auto-Owners argues in the alternative that, even if the Policy wasn't voided by Wheatridge's conduct, Auto-Owners is nevertheless entitled to summary judgment because its

actions were reasonable in this case as a matter of law.  Specifically, it points to its reliance on the assessments made by its hired appraisers and asserts that it could reasonably rely on those assessments to deny additional payments.

Wheatridge argues that, when viewing the evidence in the light most favorable to it, a reasonable jury could conclude that Auto-Owners acted unreasonably when it (1) relied on reports from biased evaluators—Rimkus and HVACi both, by their own admission, primarily conduct assessments for insurance companies and therefore have an incentive to reach unreasonably low estimates; (2) refused to consider hiring a different company to inspect the Building's HVAC unit; (3) failed to review the local building code and regulations which required a full replacement of the Building's roof under the circumstances; and (4) ignored the conclusions of the experts hired by Wheatridge to evaluate the damage to the Building, each of whom reached conclusions very different from those reached by Auto-Owners' experts.  (ECF No. 11.)

The reasonableness of Auto-Owners' conduct in this case must be evaluated in light of industry standards yet Auto-Owners presents no evidence to demonstrate that its reliance on its own experts meets those industry standards.  Based on the evidence submitted with its Motion for Summary Judgment, the Court cannot conclude that Auto-Owners' conduct was reasonable as a matter of law.  Therefore, a genuine issue of material fact remains, and summary judgment is precluded on that basis.  Auto-Owners' Motion for Summary Judgment is DENIED.

### B.  Plaintiff's Motion to Preclude or Limit Testimony of Gary Stevens, Peter Marxhausen and Mark Passamaneck

Wheatridge next asks the Court to exclude the opinion testimony of Auto-Owners' experts Gary Stevens, Peter Marxhausen, and Mark Passamaneck.  (ECF No. 90.)  Wheatridge does not contest the credentials of the experts nor their methodology in reaching their

conclusions.  Even had it done so, however, the Court concludes that all three experts are well credentialed and have applied reliable methods to support their opinions.

Auto-Owners asked Stevens to review the repair and replacement estimates provided by Compass and Severy, to determine whether those estimates were reasonable and based on fair and accurate pricing.  Stevens has been involved in adjusting insurance claims and evaluating losses since at least 1997 and has previously performed cost analysis in cases just like this one. (ECF No. 90-4.)  Stevens's report reflects careful examination of the estimates produced by Compass and Severy, done with the assistance of the Xactimate software upon which Wheatridge's own experts relied.

Marxhausen was asked to evaluate the Building and its roof to assess the hail damage and to determine the possible causes of the reported leaks.  Marxhausen is a civil and structural engineer who worked in the field of engineering forensics, meaning he performed technical investigations into such issues as building collapses, as well as leaks, construction defects, deterioration, and other similar problems, from 2004 to 2020.  (ECF No. 90-5.)  Marxhausen's report reflects the fact that, because of various repairs performed by Wheatridge on its roof in the time between the 2017 hailstorm and the time he visited it for the evaluation, he also depended very heavily on pre-existing reports, from both Auto-Owners' contractors and Wheatridge's contractors, to complete his evaluation.  He explained that because the entire lower balcony/deck had been repaired and replaced, and the upper roof had been covered with paint, including elastometric paint, prior to the site visit, he "relied upon photographs that were taken by others of the roof following the hailstorm event."

Passameneck is also a mechanical engineer with eighteen years of experience in the field of forensic engineering.  He has previously performed investigations into "commercial and

residential mechanical products and systems and associated failures, damages and injury causation." (ECF No. 90-6). His investigation, too, consisted primarily of a review of previously conducted inspections, noting that "[s]ome damage had been repaired and subsequent storm events of occurred at the property, so [he] generally relied upon the photographs of others in this evaluation."

Wheatridge argues instead that that these experts' opinions should be excluded based on the relevance prong of *Daubert*. Specifically, it asserts that because the men all inspected the Building after this litigation commenced, their reports provide only post-hoc rationalizations for the coverage decisions Auto-Owners made initially. It points to the case of *Schultz v. GEICO Cas. Co.*, 429 P.3d 844, 849 (Colo. 2018) in which the Colorado Supreme Court concluded that an insurance company was not entitled to obtain, during discovery, a new independent medical examination of the insured in relation to a claim the insurer had already denied.

In *Schultz*, the insured was involved in a car accident with an underinsured driver. *Id.* at 846. The insurer corresponded with the insured for over two years before ultimately agreeing to pay its full policy limit, without requesting that the insured undergo an independent medical examination. *Id.* The insured then sued for bad faith breach of an insurance contract and unreasonable delay in the payment of covered benefits under sections 10-3-1115 and -1116. *Id.* Only after the suit was filed did the insurer contest liability and demand that the insured undergo the examination. *Id.* The Colorado Supreme Court concluded that the reasonableness of an insurer's conduct should be evaluated based on the information that was available to the insurer at the time it acted. *Id.* at 847. The court noted that the insurer had offered no explanation for how the insured's medical condition, more than two years after the accident, would be relevant to her condition at the time the insurer made its coverage decision. *Id.* at 849. The court

distinguished the facts of *Schultz* from those of *Peiffer v. State Farm Mut. Auto. Ins. Co.*,

940 P.2d 967 970 (Colo. App. 1996), in which the insurer sought to rely on expert opinions

which were based on evidence available to it *before* it made its claim decision.  *Schultz*, 429 P.3d

at 849.  In *Peiffer*, moreover, the insurer had not conceded coverage like the insurer in *Schultz*,

and the division in *Peiffer* concluded that the testimony at issue was relevant "to support its

theory regarding highly controverted issues of fact."  *Peiffer*, 940 P.2d at 970.

Having reviewed the three expert reports at issue, the Court concludes that although the

three witnesses did visit the Building and they do occasionally mention their observations, the

bulk of their reports are based entirely on reviewing the information that was available to Auto-

Owners at the time it was adjusting this claim.  Their reports and testimony are more akin to that

provided in *Peiffer*, and like that case, the evidence they can provide goes to highly controverted

issues of fact, namely the extent of the damage caused by the hailstorm and the appropriateness

of the claims filed.  The Court is, therefore, satisfied that the testimony of Stevens, Marxhausen,

and Passamaneck will assist the jury to understand and determine facts in issue.  Wheatridge's

Motion to Preclude or Limit their testimony is DENIED.

### C.  Defendant's Motion to Exclude Expert Testimony of Chantal Roberts Pursuant to Fed. R. Evid. 702

Auto-Owners asks the Court to exclude the testimony of Wheatridge's expert witness,

Chantal Roberts, or in the alternative to either hold an evidentiary hearing to determine the

sufficiency of Roberts's opinions under Fed. R. Evid. 702, or to exclude her opinions on

particular questions.  (ECF No. 122.)  The Court concludes that a hearing on this matter is not

necessary.

While Auto-Owners does not expressly challenge Roberts's qualifications, it makes

several references suggesting that her credentials are weak.  For example, Auto-Owners notes on

more than one occasion that Roberts has never been qualified as an expert witness on insurance matters in any court.  Roberts, however, has been working in the insurance industry, as a claims adjuster, fraud investigator, and director of claims since 1997, almost 25 years.  The specialized knowledge required to provide expert testimony under Rule 702 can come through experience and training exactly like that set forth in Roberts's CV.  *See O'Sullivan v. GEICO Casualty Co.*, 233 F.Supp.3d 917, 924 (D. Colo. 2017) (concluding that experience of working in the insurance industry for more than 25 years, in a variety of capacities, and drafting report reflecting familiarity with the standards and practices of the insurance industry was "more than adequate to support [the expert's] claim that his 'background and experience' made him 'highly familiar' with industry customs and practices," thereby qualifying him as an expert witness).  The Court concludes that Roberts likewise possesses the requisite expertise to qualify her to opine on insurance industry practices and standards.

Auto-Owners objects to Roberts' testimony because, in depositions, she conceded that she was unfamiliar with the prevailing legal standards in Colorado as they pertain to unreasonable delay or denial of an insurance claim.  Auto-Owners cites no authority, however, and the Court is not aware of any, that holds that an expert witness, who is not being called to opine on a legal standard, is disqualified by a lack of familiarity with the prevailing legal standards.  The Court is persuaded by those jurisdictions that have held that "[t]he failure of the expert to be familiar with a statutory definition or standard affects his credibility, not his qualifications to testify." *Ellis v. K-Lan Co., Inc.*, 695 F.2d 157, 161 (5th Cir. 1983); *see also Friendship Heights Assocs. v. Vlastimil Koubek, A.I.A.*, 785 F.2d 1154, 1162 (4th Cir. 1986) (concluding that [s]hould the witness later fail to adequately define or describe the relevant standard of care, opposing counsel is free to explore that weakness in the testimony"); *Davis v.*

*Combustion Eng'g, Inc.*, 742 F.2d 916, 919 (6th Cir. 1984) ("The fact that a proffered expert may be unfamiliar with pertinent statutory definitions or standards is not grounds for disqualification. Such lack of familiarity affects the witness' credibility, not his qualifications to testify.").

Auto-Owners next asserts that Roberts's opinions improperly rely on national standards for claim handling and that she is therefore improperly reliant upon the Model Unfair Claims Settlement Practices Act and the portions of that Model Act that have been codified in Colorado in section 10-3-1104, C.R.S. (2021). Auto-Owners notes that not all provisions of the Model Act have been adopted in Colorado and, moreover, section 10-3-1104 does not create a private right of action for the insured.

In the Court's view, however, Roberts's reports confine their opinions to those portions of the Model Act that have been codified in Colorado. (ECF Nos. 122-15, 122-16, 122-17.) Furthermore, the Colorado Supreme Court previously concluded that the Unfair Claims Practices Act, which includes section 10-3-1104, C.R.S., provides "valid, but not conclusive, evidence of industry standards." *American Family Mut. Ins. Co. v. Allen*, 102 P.3d 333, 344 (Colo. 2004).

Auto-Owners' argument that section 10-3-1104 does not create a private right of action is entirely beside the point. As noted above, the question of whether an insurer's conduct was reasonable is determined objectively, based on proof of industry standards. *Thompson*, 457 F.Supp.3d at 1003. Section 10-3-1104 falls within the statutory provisions under which the State of Colorado defines and regulates the practices of the insurance industry in this state. §§ 10-3-101 -1716, C.R.S. (2021). To the extent that Auto-Owners believes that some different industry standards apply in Colorado, it is welcome to present evidence of those standards in its case-in-chief or through cross-examination of Roberts. "Vigorous cross-examination,

presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *O'Sullivan*, 233 F.Supp.3d at 922 (quoting Fed. R. Evid. 702 advisory committee's note).

The Court does agree with Auto-Owners, however, that Roberts cannot properly draw legal conclusions by applying law to facts. *Baumann v. American Family Mut. Ins. Co.*, 836 F.Supp.2d 1196, 1201 (D. Colo. 2011).

> "The line between permissible opinion on an ultimate issue and an impermissible legal conclusion is not always easy to discern." Permissible testimony provides the jury with the tools to evaluate an expert's ultimate conclusion and focuses on questions of fact that are amenable to the scientific, technical, or other specialized knowledge within the expert's field.

*United States v. Richter*, 796 F.3d 1173, 1195 (10th Cir. 2015) (quoting *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006)).

To the extent that Roberts frames her opinions in her reports as legal conclusions, determining whether Auto-Owners violated section 10-3-1104, the Court GRANTS Auto-Owners' Motion to Exclude her testimony. Roberts may not testify as to whether, in her opinion, Auto-Owners' conduct was unreasonable as a matter of law or that it was in violation of any statute. *O'Sullivan*, 233 F. Supp. 3d at 929. She can, however, explain how claims are generally handled in the insurance industry, including by discussing the standards for timely investigations, reservations of rights, and coverage decisions and can explain the facts that she believes demonstrate that Auto-Owners departed from those standards or fell short of them. *See Baumann*, 836 F.Supp.2d at 1202; *O'Sullivan*, 233 F.Supp.3d at 928-29. Therefore, in all other respects, Auto-Owners' Motion to Exclude is DENIED.

### D. Defendant's Motion to Exclude Expert Testimony of Mark Rothbauer Pursuant to Fed. R. Evid. 702

Auto-Owners next asks the Court to exclude any expert testimony from Rothbauer, who

has been named as a rebuttal expert by Wheatridge.  (ECF No. 123.)  Auto-Owners argues both that Rothbauer has a conflict of interest because he is being paid on a contingency basis, and that in any event his expert opinions are not reliable.  Wheatridge concedes that Rothbauer is being paid a contingency fee but argues that the fee is based on a contract that pre-dated litigation. (ECF No. 124.)  It further asserts that there is no per se rule requiring that his expert testimony be excluded, and that his opinions are reliable and based on sound methodology.

"Every person is competent to be a witness unless these rules provide otherwise.  But in a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision."  Fed. R. Evid. 601.  There is no controlling statute in Colorado that would dictate Rothbauer's competency to testify as an expert in light of his contingency fee arrangement.  Nevertheless, as a general rule, it is "a settled principle of American law: expert witnesses should not receive contingent fees."  *City & Cty. of Denver v. Bd. of Assessment of the State of Colorado*, 947 P.2d 1373, 1379 (Colo. 1997).  This principle is well accepted because "an expert witness whose fee is contingent upon the outcome is improperly motivated and can not objectively inform the court on an issue about which the court needs additional instruction."  *Id.*  Put another way, "[o]nce the expert obtains a direct financial interest in the outcome of the litigation (whether by his or her status as a party, by contingency fee agreement, or otherwise), any semblance of independence or promise of intellectual rigor that normally adheres to an expert witness is fatally wounded."  *Perfect 10, Inc. v. Giganews, Inc.*, 2014 WL 10894452 at *4 (D. Colo. Oct. 31, 2014).

Wheatridge points out that the Colorado Supreme Court expressly declined to create a per se rule that any improperly compensated witness is incompetent to testify.  *Murray v. Just In Case Bus. Lighthouse, LLC*, 374 P.3d 443, 452 (Colo. 2016).  In that case, the court concluded

that the trial court acted within its discretion when it permitted a witness who was being paid by a contingency fee agreement to testify as a non-expert summary witness. *Id.* at 453. The court directed that in cases involving this question, courts should "balance the probative value of the evidence against the danger of unfair prejudice." *Id.* at 452.

The Court notes that Wheatridge is offering Rothbauer as both a fact witness and an expert witness, thus distinguishing this case from the facts of *Murray*. In the specific context of expert testimony, "the usefulness of an expert witness 'depends in large measure on the degree to which the expert is able to convince the trier of facts of his or her strict and unyielding impartiality to both the parties and their counsel, and to the issues in the case.'" *City & Cty. of Denver*, 947 P.2d at 1379 (quoting 1 Douglas Danner & Larry L. Varn, *Expert Witness Checklists* § 1:54 (1993)).

Wheatridge's argument that Rothbauer's contingency fee agreement predated litigation does not change the Court's view. As explained by the Court in *Perfect 10, Inc.*, 2014 WL 10894452 at *4, it is Rothbauer's financial interest in the outcome of the case that creates the conflict of interest—it is no better or different than a case in which an attorney offered him a contingent fee for his testimony because the financial incentive is the same. Excluding Rothbauer's expert testimony is not a sanction on the attorney or on Wheatridge. Rather, it is this Court exercising its gatekeeping function to protect the integrity of the judicial process.

Furthermore, the Court concludes that the prejudice to Wheatridge resulting from the exclusion of Rothbauer's expert testimony would be minimal because Wheatridge has already disclosed at least one other expert to testify on the same information. According to their Rebuttal Expert Disclosures, Rothbauer would testify to "his professional opinion regarding the extent [of] damages and repair/replacement options for [the] subject property in this case related

to Plaintiff's May 8, 2017, hail loss and claim for insurance benefits."  (ECF No. 123-3.)
Wheatridge also disclosed expert witness Martin Shields, however, who it retained to testify to
"his professional opinion regarding the damages and repair/replacement options for [the] subject
property's roof in this case related to Plaintiff's May 8, 2017, hail loss and claim for insurance
benefits."  And it disclosed David Draper as an expert who would testify to "his professional
opinion regarding damages and repair/replacement options for the HVAC unit located at the
subject property in this case related to Plaintiff's May 8, 2017, hail loss and claim for insurance
benefits."

Finally, the Court notes that it will permit Rothbauer to testify as a fact witness in this
case.  His testimony as to the events that transpired during this claim process will be invaluable
to the jury, given that he was one of the key participants.  Thus, the Court concludes that
Wheatridge will suffer minimal prejudice from the exclusion of Rothbauer's expert testimony.
Given its resolution of Auto-Owners' first argument, the Court will not address its second
argument regarding Rothbauer's competency as an expert.  Auto-Owners' Motion to Exclude
Expert Testimony of Mark Rothbauer Pursuant to Fed R. Evid. 702 is GRANTED.

### E.  Plaintiff's Motion in Limine to Preclude After Acquired Evidence to Prove Past Fraudulent Intent

In its first Motion in Limine, Wheatridge asks the Court to preclude Auto-Owners from
introducing any evidence from the suit between Severy and Wheatridge for certain purposes.
(ECF No. 157).  Specifically, it objects to the introduction of such evidence to the extent it is
offered to prove that Wheatridge had fraudulent intent when it submitted the Severy invoices to
Auto-Owners for payment.  Wheatridge contends that Auto-Owners intends to argue that
Wheatridge and/or its agents already knew, at that time, that the Severy invoices were inflated.

Wheatridge asserts that the fact that it currently is engaged in litigation against Severy

and has refused to pay Severy's invoices does not prove what Wheatridge knew that the invoices were drastically inflated when it submitted them to Auto-Owners.  Wheatridge's motion on this question is meager and it cites no authority for the proposition that a party's position in related litigation cannot be used as circumstantial evidence of what that party believed at an earlier time. It asserts that the probative value of such evidence is substantially outweighed by the risk of unfair prejudice, yet it fails to explain precisely what unfair prejudice would result.

As the 10th Circuit has made clear, excluding evidence under Fed. R. Evid. 403 should be "an extraordinary remedy to be used sparingly." *Wheeler v. John Deere Co.*, 862 F.2d 1404, 1408 (10th Cir. 1988) (quoting *Romine v. Parman*, 831 F.2d 944, 945 (10th Cir. 1987)).  When ruling on a motion to exclude under Rule 403, the Court must give the evidence is maximum probative force and minimal prejudicial effect. *S.E.C. v. Peters*, 978 F.2d 1162, 1171 (10th Cir. 1992).  And the Court is concerned only with "'unfair prejudice,' that is, does the evidence have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Koch*, 2 F.Supp.2d at 1389 (quoting Fed. R. Evid. 403 adv. comm. note).

The Court cannot conclude at this time that the evidence of Wheatridge's position in the Severy litigation is inadmissible on every relevant ground, nor can it conclude that the probative value of that evidence is substantially outweighed by the danger of unfair prejudice.  Any further ruling on this question would be premature at this point.  Therefore, Wheatridge's Motion in Limine to Preclude After Acquired Evidence to Prove Past Fraudulent Intent is DENIED.

### F.  Plaintiff's Motion in Limine for a Limiting Instruction on and Motion to Preclude Improper Argument on Defendant's Fairly Debatable Affirmative Defense

Wheatridge next asks the Court to prohibit Auto-Owners from asserting that, if the insurance claim was fairly debatable, then Auto-Owners has a complete defense to the

unreasonable delay/denial claim which Wheatridge brought under the Colorado statute.[2]  (ECF No. 158.)  Auto-Owners responds that it should be allowed to argue that the claim was fairly debatable and that therefore it acted reasonably when it delayed and denied payment. (ECF No. 174.)

To some extent the parties seem to be talking past each other.  Wheatridge is correct that, in its Answer to the Amended Complaint, Auto-Owners asserted that "Plaintiff's claims for alleged common law bad faith and unreasonable delay or denial of payment of covered benefits under C.R.S. §§ 10-3-1115 & -1116 are without merit and fail as a matter of law because the disputes regarding Plaintiff's claim for Policy benefits are fairly debatable."  (ECF No. 14.) Wheatridge is also correct that "fair debatability" is not an affirmative defense to a statutory claim for the unreasonable delay or denial of benefits.  An affirmative defense exists when a defendant can assert a set of facts that, if true, will defeat the plaintiff's claim even if all of the plaintiff's allegations in the complaint are true.  *Cribari v. Allstate Fire and Cas. Ins. Co.*, 861 F. App'x 693, 709 (10th Cir. 2021) (quoting Black's Law Dictionary at 451 (8th ed. 2004)). Rather, "fair debatability" "is a factor in determining whether an insurer acted reasonably." *Schultz*, 429 P.3d at 848.  Auto-Owners seems to concede as much in its response to Wheatridge's Motion, noting that a determination that a claim was "fairly debatable" weighs against finding that the insurer acted unreasonably.

To the extent that Auto-Owners intends to argue that "fair debatability" is a complete defense to the statutory claim, Wheatridge's Motion is GRANTED IN PART.  The Court will permit Auto-Owners to argue, however, that if the claim was fairly debatable, the jury can

___

[2] Wheatridge's Motion is titled "Motion to [sic] Limine for a Limiting Instruction on and Motion to Preclude Improper Argument on Defendant's Fairly Debatable Affirmative Defense."  (ECF No. 158.)  The body of the Motion, however, makes no mention of, or request for, a particular jury instruction on this question and therefore the Court does not address that issue at this time.  Wheatridge can raise the question at trial in the context of jury instructions if it wishes to do so.

consider that fact as one factor when it decides whether or not Auto-Owners acted unreasonably, and to the extent that Wheatridge's Motion seeks the preclusion of such argument, it is DENIED IN PART.

### G.  Plaintiff's Motion in Limine to Preclude Testimony and Argument that Compass Adjusting's Contingency Agreement Creates a Moral Hazard

Wheatridge's next Motion in Limine asks the Court to preclude testimony and argument by Auto-Owners to the effect that the contingency fee agreement between Compass and Wheatridge created a "moral hazard."  (ECF No. 159.) Its concern stems from the expert report by one of Auto-Owners' experts, Steven Plitt (ECF No. 159-2) in which he concludes that "A concern exists with property claims whereby insureds may engage in opportunistic moral hazard."  He then goes on to say that some insureds may seek to claim more benefits than they are owed under their policies and suggests that that is what happened in this case.

Wheatridge is apparently concerned that Plitt "targets this argument against the public adjuster, seemingly due to Compass Adjusting's contingency contract for 10% of the adjusted insurance proceeds."  (ECF No. 159, p. 2.)  The Court first notes that Plitt makes no reference to the contingency fee arrangement in his discussion of moral hazard.  (ECF No. 159-2, pp.19-20.) But Wheatridge may be correct that Plitt is at least implying that the contingency fee arrangement creates such a moral hazard.  (ECF No. 159-2, p.25.)

Wheatridge points out that pursuant to Colorado law, section 10-2-417(4), C.R.S. (2021) public adjusters have the legal right to charge a contingency fee of up to ten percent of the total settlement proceeds in exchange for their work.  It concedes, however, that the contingency fee arrangement "may be relevant to analysis of credibility of the witnesses, Mark Rothbauer and Matt Latham," the two owners of Compass.  Nevertheless, Wheatridge suggests that the phrase "moral hazard" is so prejudicial that any testimony or argument asserting that the contingency

fee creates a moral hazard would lead a jury to conclude that "any estimates completed by Compass Adjusting are inaccurate and likely fraudulent even though they are allowed to charge a contingency amount by law."

The Court is not convinced that the mere use of the phrase "moral hazard" could cause such severe prejudice. Wheatridge concedes that the underlying information is relevant and can be introduced. In the Court's view, Wheatridge can respond to the introduction of such evidence through cross-examination and argument. In light of that conclusion, the Court DENIES the Motion in Limine to Preclude Testimony and Argument that Compass Adjusting's Contingency Agreement Creates a Moral Hazard.

### H.  Plaintiff's Motion in Limine for a Limiting Instruction on and/or to Preclude Improper Argument That Reliance on an Expert Is an Affirmative Defense

Wheatridge next asks this Court to preclude Auto-Owners from arguing that its reliance on the opinions of experts relieves it of any statutory liability for unreasonable delay or denial of an insurance benefit. (ECF No. 160.) Wheatridge also argues that Auto-Owners should be precluded from "eliciting testimony about their reasonable reliance on experts because the probative value is substantially outweighed by the likelihood such evidence will confuse the issues and mislead the jury." Auto-Owners responds that one of the elements of the statutory claim which Wheatridge must prove in order to prevail is that Auto-Owners acted unreasonably. (ECF No. 170.) It asserts that "[e]vidence establishing the reasonableness of an insurer's actions would preclude Plaintiff from making the necessary showing of unreasonableness and, thereby, negate necessary elements of Plaintiff's bad faith claims."

As previously discussed in this order, a statutory claim for unreasonable delay or denial of an insurance benefit turns on whether the insurer acted reasonably. In the Court's view, therefore, the question of whether Auto-Owners reasonably relied on an expert's opinion about

Wheatridge's claim is clearly relevant and a jury is entitled to hear evidence on that question, to make its own determination as to whether that reliance was reasonable.  The Court agrees with Wheatridge, however, that reliance on an expert's opinion does not automatically establish that an insurer acted reasonably under the circumstances of a particular case.  *See TBL Collectibles, Inc. v. Owners Ins. Co.*, 285 F.Supp.3d 1170, 1201-02 (D. Colo. 2018) (rejecting insurer's argument for summary judgment based on its reliance on the findings and opinions of an independent expert in denying the plaintiff's claim for benefits).

The Court GRANTS IN PART AND DENIES IN PART Wheatridge's Motion in Limine.  Auto-Owners is prohibited from arguing that its reliance on the opinions of experts in this case provides it with a complete, or affirmative, defense to Wheatridge's statutory claim.  Auto-Owners may, however, introduce evidence that its reliance on experts was reasonable and may argue to the jury that its conduct was reasonable in this case.  Wheatridge is entitled to present evidence and argument to the contrary.

### I.   Plaintiff's Motion to Preclude Reference to the Consequence of Finding that Defendant Unreasonably Delayed or Denied Payment of Insurance Benefits

Wheatridge's next Motion in Limine asks the Court to preclude Auto-Owners from informing the jury about the statutory penalty of treble damages that will be applied if the jury finds that Auto-Owners unreasonably delayed or denied payment of a benefit.  (ECF No. 161.)  Auto-Owners responds that it is entitled to bring that information to the attention of the jury because it is Auto-Owners' theory of the case that Wheatridge deliberately failed to cooperate and caused delays in the adjustment of its claim in order to set up a statutory claim and the accompanying treble award.  (ECF No. 171.)

The Court agrees with Wheatridge that the jury should not be informed about the statutory penalty.  The trebling of damages is a task for the court in the event that the jury finds

that there are, in fact, damages to be awarded on a claim.  § 10-3-1116(1); *see also Heritage Vill.*

*Owners Ass'n v. Golden Heritage Inv'rs Ltd.*, 89 P.3d 513, 517-18 (Colo. App. 2004) (noting

that the trial court did not err when it refused to inform the jury about the treble damages

provision because that amount was not a finding of fact to be made by the jury).  Generally, the

Court considers it the better practice not to inform juries about such statutory damages-

multiplying provisions and agrees with other courts that have so concluded.

> Generally speaking, the federal courts have recognized a policy against informing
> juries of statutory fee-and-cost-shifting or damages-multiplying provisions on the
> ground that juries so informed might decrease the damages award or find no
> liability based not on the evidence but on whether the defendant deserves to be
> penalized and the plaintiff so rewarded which would thwart the legislative
> purpose of the statute.

*Slavin v. Garrison Prop. And Cas. Ins. Co.*, 805 F. App'x 561, 570 (10th Cir. 2020).

While Auto-Owners is free to argue to the jury that Wheatridge failed to cooperate and

delayed in bad faith, it cannot inform the jurors about the treble damages provision.  The Court

GRANTS Wheatridge's Motion in Limine.

### J.   Plaintiff's Motion in Limine for a Limiting Instruction on and/or to Preclude Improper Argument on Defendant's Failure to Cooperate Defense

Wheatridge next requests the Court issue an Order precluding improper argument on

Auto-Owners' failure to cooperate defense[3].  (ECF No. 162.)  Wheatridge argues that Auto-

Owners should be prohibited from arguing that Wheatridge failed to cooperate based on what

Wheatridge asserts were mistaken invoices from Severy.  It asserts that the submission of

mistaken information, when done without bad faith, does not constitute a failure to cooperate.

Auto-Owners responds that it is entitled to argue that Wheatridge failed to cooperate in

---

[3]Once again Wheatridge titles its Motion "Motion to [sic] Limine for a Limiting Instruction On and/or to Preclude Improper Argument On Defendant's Failure to Cooperate Defense."  But as in ECF No. 158, the body of the Motion makes no mention of, or request for, a particular jury instruction on this question and therefore the Court does not address that issue at this time.  Wheatridge can raise the question in the context of the jury instructions conference if it wishes to do so.

numerous ways, including by submitting inflated invoices from Severy.  (ECF No. 178.)  Auto-Owners concedes that no party should be permitted to make misstatements of law but asserts that it has made no such misstatement.

The Court is very familiar with all of the filings in this case, and it concludes that Auto-Owners is correct, it has never suggested that a mere mistake would equate to a failure to cooperate.  Wheatridge is correct that "what might appear initially to be a breach of the cooperation clause 'may be excused, if it develops that the failure of the assured was due to mistake, and that there was no exercise of bad faith on his part.'"  *Ma v. Auto-Owners Ins. Co.*, 2021 WL 2473898, at *8 (D. Colo. June 17, 2021) (quoting *Hansen v. Barmore*, 779 P.2d 1360, 1364 (Colo. App. 1989)).  But it is for the jury to decide whether Wheatridge submitted mistaken information by accident, or whether it acted in bad faith.  To the extent that it asks the Court for an order prohibiting Auto-Owners from misstating the law, that request is DENIED because it is moot, as Auto-Owners has conceded it cannot do so.  To the extent Wheatridge asks the Court to prohibit Auto-Owners from arguing that Wheatridge failed to cooperate because it submitted false information, that request is also DENIED.  Wheatridge is free to introduce evidence in support of its theory that it did not recognize the inaccuracy of the Severy invoices until after they had been submitted and to argue the same to the jury.

### K.  Plaintiff's Motion in Limine to Preclude Evidence of Severy's[4] Material and Labor Costs from ALM Roofing Services, LLC

Wheatridge next asks the Court to preclude Auto-Owners from introducing any evidence of the actual costs billed by the subcontractor, ALM Roofing Services, LLC, who worked to make emergency repairs to the roof, and who's expenses were part of the invoice from Severy.  (ECF No. 163.)  Wheatridge argues that the underlying costs are irrelevant because the Policy

---

[4] Steve Louden is the owner of Severy Creek Roofing.  Although Wheatridge' Motion refers to him personally, for purposes of clarity and consistency with the remainder of its Order, the Court will refer to instead to Severy.

required Auto-Owners to pay the replacement cost for the roof which the Policy defines as the "amount actually spent that is necessary to repair or replace the lost or damaged property." Wheatridge asserts that it was liable for the amount billed by Severy, and that therefore the full amount of the invoice was the "amount spent" and the amount due under the policy. Wheatridge also states that it has abandoned any claim for coverage on the Severy invoices, and that therefore all information related to the underlying costs for those repairs has been rendered irrelevant.

Auto-Owners responds that under the Policy it was only liable for the amount *necessary* to make the repair, and it argues that Severy's inflated charges for profit and overhead were not *necessary*. (ECF No. 177.) It also contends that the evidence supports a conclusion that Wheatridge and its agents knew that the Severy invoice was inflated, pointing out that Wheatridge never actually paid the invoice. Auto-Owners also correctly notes Wheatridge cites to the failure to pay for the temporary repairs made by Severy/ALM Roofing as part of the basis for its unreasonable delay/denial claim. Finally, Auto-Owners argues that, even if Wheatridge has abandoned its claim to coverage for the Severy charges, the overcharging in those invoices is relevant to Auto-Owners' defenses and counterclaims, and therefore should not be excluded.

The Court agrees with Auto-Owners that the actual costs to repair the Building's roof are relevant and admissible in this case. As previously noted, one of the key points of contention between the parties is whether Wheatridge and its agents knew the Severy invoices were inflated at the time they submitted them to Auto-Owners for payment, or whether they came to that conclusion only later. Evidence of the actual costs of such repairs will allow the jury to consider whether Wheatridge and its agents could have been unaware of Severy's inflation or whether, based on prior experience, they would have been likely to know that the bill total was

38

inconsistent with what it should have been.

The Court is satisfied that the actual costs of the emergency roof repairs are relevant in this case and are more probative than they are prejudicial.  Wheatridge's Motion to preclude that evidence is therefore DENIED.

### L.  Plaintiff's Motion in Limine to Preclude Argument and Testimony that the Difference in Estimates' Values Constitutes a Misrepresentation of Material Fact

Wheatridge's next Motion in Limine asks the Court to exclude any testimony or argument that would suggest that when Rothbauer and Latham adjusted the amounts in Xactimate, the resulting estimates constituted misrepresentations of material facts.  (ECF No. 164.)  Wheatridge reiterates the argument it made in its Motion for Partial Summary Judgment, that to the extent that any of the resulting estimates were inflated, the excess amounts were merely "puffery" and that, in any event, the estimates were only predictions of future events and therefore not actionable.  Wheatridge asserts that this issue would be "better resolved by a simple determination at law that estimating costs of a claim, by itself, cannot constitute misrepresentation unless the fraudster is intentionally disregarding facts it knows to be true."

Auto-Owners points out, in response, that Wheatridge still wishes to use the estimates generated by Rothbauer and Latham as the evidence to prove the amount benefits to which it was entitled.  (ECF No. 175.)  Auto-Owners also points out that in this jurisdiction a party can breach a misrepresentation clause without affirmatively disregarding evidence—an insurer "must show only that an insured or its agent knowingly misrepresented or concealed information.  While this showing could be made by establishing that the insured or its agent disregarded certain information, it can also be shown through evidence that the insured or its agents had no support for its estimate."

In the Court's view, the question of whether the Compass estimates were made in good faith or whether they were material misrepresentations is a fact question for the jury. Auto-Owners can offer evidence in support of its argument that when Rothbauer and Latham manipulated Xactimate they deliberately misrepresented the projected costs to repair the Wheatridge Building. It can attempt to prove that Wheatridge submitted those estimates to Auto-Owners in order to receive payments in those amounts. Wheatridge, in turn, can offer evidence to support its argument that manipulation of Xactimate is necessary to create accurate cost projections and that it is common practice among adjusters, including at Auto-Owners itself. A jury can determine which version of events is more credible. The Court agrees with Auto-Owners that Wheatridge cannot rely on the Compass estimates to prove its damages yet assert that those numbers are irrelevant because they were meaningless predictions about the future. Therefore, the Court DENIES Wheatridge's Motion in Limine.

### M. Plaintiff's Combined Motion to Strike Late Witness Designation of Jerry Payne and Motion in Limine to Preclude Introduction into Evidence of His Axium Report

Wheatridge's final Motion in Limine asks the Court to preclude Auto-Owners from introducing the Axium Report and from calling Jerry Payne, the preparer of that report, to testify. (ECF No. 165.) Wheatridge notes that the discovery deadline in this case was October 23, 2020, and Auto-Owners did not disclose its intent to call Payne until February of 2021, at which point Wheatridge could no longer depose him. Wheatridge also argues that the Axium Report is inadmissible hearsay as its only probative value is for the truth of the information asserted therein—namely, whether there was preexisting damage to the Building before the May 8, 2017, hailstorm. And even if it is not hearsay, Wheatridge argues that it is expert opinion which makes the failure to disclose it all the more harmful.

Auto-Owners responds that Wheatridge knew that Payne was a potential witness because it knew of the existence of the Axium Report and because Auto-Owners included in its initial disclosures its intent to call any witness necessary to authenticate any document. (ECF No. 172.) Auto-Owners argues that in any event, even if its disclosure was late, there was no prejudice to Wheatridge because it always knew of the existence of the Axium Report and could have contacted Payne at any time. It also expressly noted that it would not object to any request by Wheatridge to depose Payne before trial. Finally, Auto-Owners asserts that it "does not intend to seek admission of the [Axium] Report for purposes of establishing that any opinion regarding the functionality of any component are accurate." It therefore declines to address Wheatridge's arguments regarding the failure to designate Payne as an expert or the admissibility of the Report under Rule 701.

Auto-Owners does not dispute that it did not specifically name Payne as a witness until after the discovery deadline had passed. Federal Rule of Civil Procedure 37 provides that if a party fails to identify a witness as required by Rule 26(a) or (e), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." In order to determine whether such a failure was justified or harmless, the Court considers "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999).

Assuming that Auto-Owners' original disclosure of its intent to call "[a]ny person identified in discovery or in any document produced in this litigation" and "any witness

necessary to authenticate documents" (ECF No. 172-1) were inadequate, the Court must determine if the failure was either justified or harmless. As an initial matter, the Court cannot conclude that Auto-Owners' failure was justified. Auto-Owners argues that it did not receive the Axium Report from Wheatridge until part way through discovery. That is true, but the record reflects that the Axium Report was disclosed on January 14, 2020, more than nine months before the close of discovery and more than a year before Auto-Owners apparently did disclose its intent to call Payne.

Turning to the *Woodworker's* factors, the Court nevertheless concludes that it would be harmless for Payne to testify to the authenticity of the Axium Report, assuming it is admissible (discussed below). First, the prejudice to Wheatridge is, in fact, minimal. Wheatridge did have the Axium Report in its possession since before the inception of this litigation, and therefore knew of Payne's identity. In addition, although it made the disclosure late, Auto-Owners did inform Wheatridge of its intent to call Payne more than a year before trial in this case and expressly noted that it would not object if Wheatridge wished to depose Payne despite discovery having closed. For that reason, too, Wheatridge had an opportunity to cure any prejudice it may have suffered from the late disclosure. Wheatridge does not argue that the admission of Payne's testimony would disrupt trial, nor does it assert that Auto-Owners acted in bad faith in disclosing late. The Court concludes, therefore, that admission of Payne's testimony for purposes of authenticating the Axium Report would be harmless.

Wheatridge also asks the Court to exclude the Axium Report as hearsay and Auto-Owners responds that (1) it is not hearsay and (2) if it is hearsay it falls within the business records exception to the hearsay rule. The Court agrees with Wheatridge that the Axium Report is clearly hearsay—it is a statement, made by the declarant outside of court, which is offered to

probe the truth of the matter asserted.  Fed. R. Evid. 801(c).  Auto-Owners argues that it does not

intend to introduce the Axium Report for its truth, but rather only to show that Wheatridge was

aware of preexisting damage to the property.  If the content of the Axium Report were not true,

however, then Wheatridge's knowledge of its contents would be entirely irrelevant.  Under Auto-

Owners' theory of the case, Wheatridge had an obligation to disclose the information in the

Axium Report during the adjustment process because that Report would have permitted Auto-

Owners to account for the damage to the Building that predated the hailstorm and, in Auto-

Owners' view, it had no obligation to pay for any such damage.  Thus, the Court concludes that

the Axium Report is hearsay because it is being offered for the truth of the matter asserted.

Auto-Owners asserts that even if it is hearsay, the Axium Report is admissible as a

business record pursuant to Federal Rule of Evidence 803(6), which allows for the admission of

> Records of a Regularly Conducted Activity.  A record of an act, event, condition,
> opinion, or diagnosis if:
>
> (A) the record was made at or near the time by—or from information transmitted
> by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a
> business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another
> qualified witness, or by a certification that complies with Rule 902(11) or (12) or
> with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or the method or
> circumstances of preparation indicate a lack of trustworthiness.

The Court concludes that the Axium Report does meet the business records exception.

The Axium Report was prepared in the normal course of Axium Inspection's business as

a pre-purchase inspection when Wheatridge was deciding to buy the Building.  Although the

Axium Report is undated, no party contests that it was prepared close in time to when the

inspection was performed, and that it was prepared by a professional inspector, apparently Payne.  The preparation of inspection reports is clearly a regular practice for those who perform home and building inspections for prospective buyers.  And although Wheatridge suggests that it might wish to call into question Payne's techniques and methodologies, the Court notes that Wheatridge apparently found the information in the Axium Report to be sufficiently trustworthy to base its decision to purchase the Building on its results.  If Auto-Owners can call a witness to testify to all of these conditions the Court concludes that the Axium Report is admissible hearsay pursuant to the business records exception.  Therefore, the Court DENIES Wheatridge's Motion and concludes that Payne may testify to the authenticity of the Axium Report.  The Court notes, however, that Auto-Owners has specifically denied that it intends to admit Payne as an expert to testify to the accuracy of the Axium Report and the Court expects that Auto-Owners' use of this evidence will be thus limited.

IV.    **CONCLUSION**

Accordingly, it is **ORDERED**

    (1)        That Wheatridge's Motion for Partial Summary Judgment (ECF No. 118) is DENIED;

    (2)        That Auto-Owners' Motion for Summary Judgment (ECF No. 120) is DENIED;

    (3)        That Wheatridge's Motion to Preclude or Limit Testimony of Gary Stevens, Peter Marxhausen and Mark Passamaneck (ECF No. 90) is DENIED;

    (4)        That Auto-Owners' Motion to Exclude Expert Testimony of Chantal Roberts Pursuant to Fed. R. Evid. 702 (ECF No. 122) is GRANTED IN

PART AND DENIED IN PART;

(5)        That Auto-Owners' Motion to Exclude Expert Testimony of Mark Rothbauer Pursuant to Fed. R. Evid. 702 (ECF No. 123) is GRANTED;

(6)        That Wheatridge's Motion in Limine to Preclude After Acquired Evidence to Prove Past Fraudulent Intent (ECF No. 157) is DENIED;

(7)        That Wheatridge's Motion in Limine for a Limiting Instruction on and Motion to Preclude Improper Argument on Defendant's Fairly Debatable Affirmative Defense (ECF No. 158) is GRANTED IN PART and DENIED IN PART;

(8)        That Wheatridge's Motion in Limine to Preclude Testimony and Argument that Compass Adjusting's Contingency Agreement Creates a Moral Hazard (ECF No. 159) is DENIED;

(9)        That Wheatridge's Motion in Limine for a Limiting Instruction on and/or to Preclude Improper Argument That Reliance on an Expert Is an Affirmative Defense (ECF No. 160) is GRANTED IN PART AND DENIED IN PART;

(10)       That Wheatridge's Motion to Preclude Reference to the Consequence of Finding that Defendant Unreasonably Delayed or Denied Payment of Insurance Benefits (ECF No. 161) is GRANTED;

(11)       That Wheatridge's Motion in Limine for a Limiting Instruction on and/or to Preclude Improper Argument on Defendant's Failure to Cooperate Defense (ECF No. 162) is DENIED;

(12)       That Wheatridge's Motion in Limine to Preclude Evidence of Steve

Louden's Material and Labor Costs from ALM Roofing Services, LLC (ECF No. 163) is DENIED;

(13)     That Wheatridge's Motion in Limine to Preclude Argument and Testimony that the Difference in Estimates' Values Constitutes a Misrepresentation of Material Fact (ECF No. 164) is DENIED; and

(14)     That Wheatridge's Combined Motion to Strike Late Witness Designation of Jerry Payne and Motion in Limine to Preclude Introduction into Evidence of His Axium Report (ECF No. 165) is DENIED.

DATED this 4th day of January, 2022.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge